## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-0147 TJK** |
| **v.** | : | |
| | : | |
| **NOLAN FREEMAN,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Nolan Freeman pled guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Nolan Freeman to 30 days of incarceration on Count One and 36 months of probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Nolan Freeman, a 34-year-old delivery driver from Dayton, Nevada, participated in the January 6, 2021, attack on the Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The government's sentencing recommendation of 30 days' incarceration is supported by (1) his entry into the Capitol through a broken window 12 minutes after the Capitol was first breached; (2) the length of time he remained inside the Capitol—26 minutes; (3) the fact that he continued, like many others, to witness chaos and violence and then immerse himself in recording, rather than simply leaving; and (4) his lack of remorse.

The Court must also consider that the Defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for Freeman's actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Freeman's crimes support a sentence of 30 days' incarceration, 36 months' probation, and 60 hours of community service.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1 (Criminal Complaint) and ECF No. 21 (Statement of Offense).

*Defendant's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Freeman flew cross country from Sacramento, California to the District of Columbia.  Two days later, Freeman, who was wearing a red hoodie covered with a black jacket and a red hat with white lettering, attended the rally at the ellipse in Washington, D.C. As would be his practice throughout the day on January 6, Freeman used his mobile phone to capture the events at the rally.

*Image 1: Open-Source Photograph of Freeman at the Stop-the-Steal Rally.*



Afterward, he, along with throngs of others, walked eastbound down Constitution Avenue toward the Capitol.  From his vantage point depicted in Image 2 below, Freeman could hear a chorus of rioters chanting "U.S.A." and another rioter on a bullhorn preaching that the election had been stolen.

*Image 2 : Open-Source Screenshot of Freeman Approaching the Capitol*



Afterward, Freeman crossed the restricted perimeter surrounding the Capitol and moved closer to the Capitol itself.  As depicted in Image 3 below, Freeman eventually made his way to the Northwest Courtyard.  While in that area, Freeman heard rioters chanting, "This is our house," and observed Capitol Police officers, dressed in riot gear, standing guard outside the Parliamentarian's Door, which would eventually be breached by other rioters at 2:42 p.m.

*Image 3: Open-Source Screenshot of Freeman in Northwest Courtyard*



  Freeman entered the Capitol at 2:23 p.m. through a broken window next to the Senate Wing Door, which is situated approximately 50 yards from where Freeman was standing in Image 3 above.  The Capitol building had been breached only 12 minutes earlier, when a rioter smashed a window next to the Senate Wing Door. Freeman's entrance through that same window was captured on both CCTV (Image 4 below) and open-source video (Image 5 below).  On his approach to that broken window, Freeman would have observed other rioters climbing through the broken window shortly before Freeman entered   As he got closer to the window, he would have observed shattered glass.  As he was entering through the broken window, he would have seen broken glass and debris on the ground.  As discussed in more detail below, Freeman would spend the next 26 minutes inside the building.

*Image 4: CCTV Screenshot of Freeman entering the Capitol
through a broken window adjacent to the Senate Wing 2:23:31 p.m.*



*Image 5: Open-Source Screenshot of Freeman
Just After Entering Capitol Through a Broken Window*



Immediately upon entering, Freeman raised his mobile phone in his left hand and pirouetted 360 degrees, presumably to capture a panorama of his first moments inside the Capitol.

*Image 6: CCTV Screenshot of Freeman Videotaping Inside of Senate Wing Corridor at 2:23:37 p.m.*



Freeman spent approximately 30 seconds inside the Senate Wing before walking down a corridor toward the Crypt. By this time had had transferred his mobile phone from his left to his right hand.

*Image 7: CCTV Screenshot of Freeman Proceeding Toward Corridor Leading to Crypt at 2:24:10 p.m.*



By 2:25 p.m., Freeman had made his way to the Crypt. There, Freeman observed hordes of other rioters, many of whom were loudly chanting "Stop the Steal." As depicted in Image 8 below, Freeman continued to film the chaos before him.

*Image 8: CCTV Screenshot of Freeman in Crypt at 2:25:38 p.m.*



Still capturing the events on his mobile phone, Freeman next exited the Crypt through the Memorial Door heading toward the Rotunda.

*Image 9: CCTV Screenshot of Freeman Approaching Memorial Door at 2:28:32 p.m.*



Freeman's next stop was the Rotunda, where he continued to film throng of rioters, some of whom were dressed in tactical gear and others waving various flags, who were in unison chanting "America First."

*Image 10: CCTV Screenshot of Freeman in Rotunda at 2:33:31 p.m.*



As depicted in Image 11 below, Freeman stopped with another rioter in the Rotunda to take a selfie at the foot of the Abraham Lincoln statute.

*Image 11: Open-Source Photo of Freeman in Rotunda.*



After leaving the Rotunda, Freeman proceeded to Statuary Hall (Image 12), walked down the Main Door Hall (Image 13), approached the East Stairs (Image 14), and made his way to the

Upper House Door (Images 14 and 15) where he finally exited at 2:49 p.m.  He continued filming

throughout this final leg of his presence in the Capitol.

*Image 12: CCTV Screenshot of Freeman in Statuary Hall at 2:40:06 p.m.*



*Image 13: CCTV Screenshot of Freeman*
*Walking Down Main Door Hall at 2:43:31 p.m.*



*Image 14: CCTV Screenshot of Freeman Approaching East Stairs at 2:43:36 p.m.*



*Image 15: CCTV Screenshot of Freeman by the Upper House Door at 2:49:04 p.m.*



*Image 15: CCTV Screenshot of Freeman Exiting Through Upper House Door at 2:49:09 p.m.*



*The Charges and Plea Agreement*

On March 21, 2024, the United States charged Freeman by a four-count Information for violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). ECF No. 6. On September 6, 2024, pursuant to a plea agreement, Freeman pleaded guilty to Counts Three and

Four of the Information.   ECF No. 20.   By plea agreement, Freeman agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Freeman now faces sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G).   As noted by the plea agreement and the U.S. Probation Office, Freeman faces up to six months for each of those offenses and a fine of up to $5,000 per count.   Freeman must also pay restitution under the terms of their respective plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   As these offenses are Class B misdemeanors, the Sentencing Guidelines do not apply.   18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days incarceration and 60 hours of community service.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).   While assessing Freeman's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.   Notably, for misdemeanor defendants like Freeman, the

absence of violent or destructive acts is not a mitigating factor. Had he engaged in such conduct, he would have faced additional criminal charges.

The most important factors in this case are (1) entry into the Capitol through a broken window 12 minutes after the Capitol was first breached; (2) the length of time he remained inside the Capitol—26 minutes; (3) the fact the he continued, like many others, to witness chaos and violence and then immerse himself in recording, rather than simply leaving; and (4) his lack of remorse.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days of incarceration, 36 months of probation, and 60 hours of community service.

## B. Freeman's History and Characteristics

Aside from his teenage drug use (PSR at ¶¶ 44-47) and prior arrest for a violent crime when he was 18 (PSR at ¶ 28), Freeman's history and characteristics are unremarkable. While his biological father was absent most of his life, he was raised by his mother who appeared to have provided a loving environment that was free from abuse, neglect, and violence. PSR at ¶ 34. While Freeman's childhood was not steeped in privilege, he certainly experienced nothing that would provide a mitigating factor for this Court to consider. To the contrary, Freeman's relatively stable upbringing has afforded him advantages that many defendants lack, which culminated in his work as a television actor. Despite that good fortune, he chose to participate in the riot.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

14

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this Defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence also weighs in favor of a term of incarceration. Most importantly, Freeman has shown no remorse for his actions on January 6, 2021.  Approximately three months ago – before Freeman entered a plea on this case – a YouTube account bearing his name and photograph posted a two minute and twenty-one second video that

depicts news reports of his arrest and footage of the January 6 riot over a choir singing the National Anthem.[2]   A commentor posted a message underneath that video that "you gotta pay your dues . . . next time think for yourself instead of being like a sheep," to which Freeman responded, "With pleasure, and right back at ya toots."



Whatever else this video and exchange may say about Freeman, it unequivocally establishes the lack of remorse he has for his actions on January 6, and it demonstrates his unbridled pride for what he has done as well as an apparent enthusiasm to suffer "with pleasure" whatever consequences this Court might impose.

---

[2] https://youtu.be/N1H3fOUVKIg?si=oLX2XTp2DsMpK4ls

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Freeman based on their own conduct and relevant characteristics, but should give substantial weight to the context of the unlawful conduct: his  participation in the January 6 riot.

Freeman pleaded guilty to Counts 3 and 4 of the Information, respectively charging disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D), and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Both offenses are Class B misdemeanors. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Rafael Valedez*, 21-cr-695 (JEB), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating or Picketing in a Capitol Building) and received 30 days' incarceration followed by 36 months' probation. The similarities between *Valedez* and *Freeman* are many: like Freeman, Valadez entered the Capitol through a broken window adjacent to the Senate Wing Door (Valdez entered three minutes before Freeman); each spent exactly 26 minutes inside the Capitol; both spent time in the Senate Wing, Crypt, and Rotunda; each extensively used their mobile phone to capture the events unfolding before them; and neither demonstrated remorse as evidenced by their post-January 6 social media postings. The only detectable differences between the two cases is that: (1) Valedez was more prolific on social media after January 6 – insofar as the Government is aware, Freeman posted just the YouTube video referenced above while Valedez used multiple platforms to post celebratory comments about the events of the day; and (2) Valedez has a bit more of a criminal history than Freeman, having three prior arrests which all occurred 20 years ago and resulted in a single conviction in 2001 for throwing objects or substances from a motor vehicle. The government requested 45 days incarceration, and Chief Judge Boasberg sentenced Valedez to 30 days' incarceration followed by 36 months' probation.

In *United States v. Daniel Warmus,* 21-cr-417 (PLF), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating or Picketing in a Capitol Building) and received 45 days' incarceration followed by 24 months' probation. Warmus spent 15 minutes inside the Capitol, which was 11 minutes shorter than the 26 minutes that Freeman spent in the building. Much like Freeman, Warmus is seen extensively photographing both inside and outside the Capitol. Unlike the Freeman, however, Warmus videotaped assaults

on police officers.  The government requested a sentence of 30 days' incarceration, and Judge Friedman sentenced him to 45 days' incarceration followed by 24 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Freeman must pay $500 in restitution, which reflects in part his role in the riot on January 6.[5]  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  Freeman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 81.

## VI.    Fine

The Defendant's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000.00.  *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendants' income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The burden is on the Defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Defendant Nolan Freeman to 30 days' incarceration on Count Three and 36 months' incarceration on Count Four, along with 60 hours' community service and the agreed upon restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Freeman's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

BRIDGET M. FITZPATRICK
ACTING UNITED STATES ATTORNEY
D.C Bar No. 474946

By: */s/ Jack Burkhead*
JACK BURKHEAD
Assistant U.S. Attorney
NM Bar No. 10493
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
jack.e.burkhead@usdoj.gov